Good morning, Your Honors, and may it please the Court. North Carolina has authorized gasoline distributors to purchase ethanol from third parties and to add it to gasoline. North Carolina's law conflicts with federal law in three ways. First, it conflicts with the Lanham Act, which and to forbid the sale of commingled trademark products. Second, it conflicts with the Petroleum Marketing Practices Act, which allows franchises to be terminated for trademark violations and expressly preempts state laws that narrow the grounds for termination. And third, it conflicts with the Federal Renewable Fuel Program, which establishes a flexible framework for meeting federal renewable fuel obligations. Now as to the Lanham Act and trademark law, trademark owners have both a right and a duty under federal law to control the quality of their products. The District Court acknowledged that important principle and it held that the North Carolina law can be interpreted to allow testing of splash blended fuel and the District Court stopped short of taking what we think is the next necessary step of saying that refiners may require inline blending of ethanol as a quality control measure. The parties agree that inline blending is a form of quality control. That's in the state's brief at page 23. The refiners believe and there's abundant evidence in the record to say that inline blending leads to fewer errors in blending and less costly errors. The District Court did not make that finding. Well, I mean this case comes to the court on summary judgment and so what is in the record is that with inline blending the amount of ethanol is measured by computer, not by the truck driver. It's mixed in a controlled way by the computer as you go and if the computer detects an error it won't allow the tanker truck to leave the terminal whereas with splash blending the truck driver does the measurements, the mixing occurs hopefully when the truck bounces along the road. You're saying the court needed to accept the proposition that the inline blending was the best way to do it. Well, the court didn't allow us to get to trial on that. Well, but on the summary judgment she had to take the view. The facts investigate for you. For you. Yes. And you say inline blending is better than splice blending is what I thought, right? You like inline blending. That's correct. Your client does or your other clients. Is there a standing problem here? You're raising these issues about these trademarks. Do you have standing to do that? Well, my clients are the associations for the industry so we have associational standing or the members would have standing to bring this case and so on. You don't produce any gasoline and blend any of it or anything like that. No, the association. Like Shell does, right? The members do. But that's getting off track. But the inline blending is what you say because it's here on summary judgment, the court needed to look at it in the light most favorable to your side. Yes, exactly. Which is that inline blending, that splice blending has quality control problems. That's correct. That's what your record shows in light most favorable to you. That's exactly right. And one of the most important aspects of trademark law is control of the quality of the product. So being told that you can't use what you think is the best way to prevent these errors, which can be very serious, is a very serious loss of trademark rights. This goes to 10% of this ethanol in there? Most of the fuel sold today is 10%. It is legal to sell fuel. If it varies up to 15%, does that make the car run rougher than that? Well, there's a lot of dispute about that. I think the EPA's position is it could make older cars run rougher and the car manufacturers and the American Automobile Association think there could be a problem with newer cars as well. So that's one of the big problems here. Can marketers use this inline blending? Well, marketers could if they wanted to install it. Now, one of the advantages of inline blending is that you blend the gasoline and the ethanol as you put it into the tanker truck. And that's an advantage because if you do it one after the other, then you only reach the right mixture at one point at the very end. And if something goes wrong, if the equipment breaks down, the truck driver is not watching at the correct moment, you're off. So for distributors to do it, they would have to first buy the inline blending equipment and then you'd actually have to pump the gasoline back out of the tank. That's a pretty fancy maneuver. Well, it could be done. It could be done. And frankly, that would be a huge improvement. I mean, then there would be this better method of inline blending. I have to tell you, I have a little bit of trouble digesting all this stuff at once. And so I'm looking to you and your colleague on the other side to make this a little clearer for me. But the only way you get to the Lanham Act is your argument about preemption, right? Well, I think it comes up in two ways, and I can simplify it a bit. There is an argument about, we make an argument about preemption under the Lanham Act. We also make some arguments under the Petroleum Marketing Practices Act, which is closely connected because one of the ways you can violate the Petroleum Marketing Practices Act is if there's any form of trade- But that's a preemption argument as well, isn't it? Well, the PMPA has an express preemption provision, which this court has interpreted in Mobile Oil very broadly. So one way to simplify the case is on the branded products, the product that has an Exxon or a Shell brand on it. There are the Lanham Act arguments, and there are the PMPA arguments. We think they both lead to the same conclusion. You wouldn't necessarily have to decide both of them. You can win if you pick up either one of them. Right, I understand that. So I don't know if that simplifies it a bit. There's one other key point that I think might also simplify it, and frankly this helped me as I was getting ready for this argument. On both the Lanham Act and the PMPA, I think if you set aside the state law for a minute, imagine North Carolina had not passed this statute. We think it is very clear under both trademark law and the PMPA that if a distributor were to, without permission from the refiner, add unbranded gasoline, another brand of gasoline, ethanol, anything, any substance to a trademark product, that would be a clear trademark violation. It's called different names. We cite about five cases. I have them right here. But you're required under federal law to add ethanol. Well, yes. We know that's not a violation because you're required to do that. That's an excellent question. In some of these cases, for example, Amoco against DZ Enterprises, which is one that we cite, there are all sorts of requirements for gasoline with or without ethanol. But you're not challenging that requirement that you all add the ethanol. Well, we're not challenging the requirement that the ethanol has to be there. But under trademark law, in this DZ Enterprises case, even if it's exactly that. This is your argument that when the distributor puts the 10% in, you're getting jipped out of 10% of your branded sales revenue. Yeah, that's absolutely right. The thing I couldn't understand, and I know you're more expert in this than I am, is why doesn't the market take care of that? Okay, then charge more for the 90%. I mean, it just seems to me that it's entirely in your hands. Well, I mean, one thing is it's already legal to sell what's called E85. That's 85% ethanol. Not much of that is sold yet outside the Midwest. But if the court approves what North Carolina is doing here, it could be not just 10%, it could be 85% or even more. And then in these cases, like the DZ Enterprise case, the court said, you know, it really doesn't matter if the product is chemically identical. It really doesn't matter about anything except that the trademark owner gets to designate what is the genuine product. And it is largely for the reason you say, that the way they get compensated for all their investment in the trademark, the advertising, keeping up the good reputation of the mark, is selling the trademark product. So if a distributor can add in 10% or 85% of something else and not pay the trademark owner, that is, as you say, chipping them. But even if they... You're saying it's no longer Exxon Gasoline. Well, exactly. And that's what... Automobile. But what you sell, the blended product that you sell, is no longer 100% gasoline either. Well, and that's... If you read... What is genuine Exxon Gasoline is what Exxon says is genuine gasoline. These cases, DZ Enterprises, Shell against Ray Thomas Petroleum, Shell against Devar, Aoud against Mobil. Some of these cases, it was the same stuff. It came from the same tank, and that was the distributor's defense. And the court said it's only genuine trademarked Exxon Gasoline, take Exxon, for example, if the trademark owner says so. And it's because of both the control of quality, which is so important. That's really what trademark is all about. And it's for the ability to get compensated for the mark. Were any of those cases decided in the Fourth Circuit? Well, the Mobil Oil case and the Shell case... Well, the cases I'm... You said there are four or five cases you had there in your hand. None of these particular cases are... These, I thought, were particularly good on this notion of if you're adding anything to a trademark product without permission from the trademark owner. But I think this court has very strong law. The Shell Oil case, this was a 1991 case, 9-28-F-2-104. This was a case where a product was being sold, and they weren't even using the trademark. They were using sort of a code for it, the initials. Well, after that, we decided the Mobil case. Yes. And under Mobil, as I understand it, the test was whether there's a significant negative impact on the trademark owner's quality control efforts. And as I understand this case, the district court said, particularly as regards to Lanham Act, that your clients can come in, and they can test this at the gas station where it's going to be pumped, and if it's not properly blended ethanol, well, then they have contractual remedies that they can pursue against the distributors, and that's sufficient to maintain quality control. But why is that wrong? Well, because once you have to sue somebody for trademark violations, then you've suffered harm to the mark. The whole idea of quality control is to avoid mistakes and to provide a good quality product all the time, or as much of the time as you can. So saying, well, wait till the problems happen, wait till the consumers are upset, and then you can sue your distributor is really inadequate and not what trademark law is trying to accomplish. And even saying, well, you could do some testing, you know, after the splash blending happens, it's, as we were discussing, it's just inherently a lesser quality control standard because you... What's the main fact you want a trial on on your Lanham Act claim? Well, now, to be honest, we don't think necessarily we have to go back for a trial. I mean, if you agree with us that... Well, let's assume that you do. Okay, assume that we do. Yeah, I think the number one fact would be if you thought, well, you have to show that inline blending is better. We think absolutely we would win that issue at trial hands down, and so we would certainly need to go back for a trial on that before a court could say, oh, no, it's no better. It's just the same as splash blending. So that, I think, would be the key issue for trial, if we sent it back for trial. What does the customer know? Does the customer know there's been inline blending or not? Absolutely not, and that's another way to look at this case. The customer, because of the trademark, assumes that when they buy... Again, we're just using Exxon as an example. When they buy Exxon gas, they're assuming that either Exxon made it, that, in fact, was the original meaning of a trademark, that Exxon actually made it, or that Exxon controls and agrees with every step of how it was produced. And so under this state law, Exxon doesn't agree. They don't agree with the splash blending, but nevertheless... So the state wouldn't put that label on the gas that it... I'm using gas generally. I know that ethanol is put into it. The blended product that Exxon produces, the state, I guess, Exxon will put on the thing, the pump, that it's an Exxon product approved, blah, blah, but on the product that when they sell unblended product and it's blended in the state, then that sign won't be on it. So there won't be a... The mark will still be retained, right? Well, no, I mean, the point is, if it's a product that's got the Exxon trademark on it, but under the state law, the distributor has added in ethanol using the splash blending against Exxon's will, then the customer thinks, oh, Exxon either made this or approves of how it was made, but that's not true. That's actually deceptive. Exxon doesn't approve. The alternative is not accurate. Exxon did not approve how it was made. Exactly. You sold 90% of the product to the distributor. The distributor put in 10% of this ethanol corn product and ran it down the road and said, we want to mix it up enough. And furthermore, did it in a way that Exxon doesn't approve of. And is such a product being sold in North Carolina? I'm not sure of the answer to that question. There is a point in the record that not a lot of the distributors are actually demanding to have unblended gasoline under this new statute. That was another problem that I had. I wasn't sure you were quite to litigation here. It seemed to be pretty preliminary. I wasn't sure. We brought this when the statute was enacted as a declaratory judgment. I know there used to be the tax credit and so forth, but that doesn't exist anymore, right? But the members still want to know how to conform their conduct to law. What they'd like to do is to say inline blending is better. We have to do inline blending. But we usually only decide actual cases in controversy. Well, of course. But I think we have an actual case in controversy because there's a pressing need for the refiners in North Carolina to know how to structure their business. But there aren't any refineries in North Carolina. There are no refineries in North Carolina, but there are refiners who are bringing in refined gasoline and would like to have it blended with ethanol in the way that they think is the best quality. If I'm driving down through Virginia and I'm looking for Exxon, I better buy it in Virginia rather than wait until I get to North Carolina. You're not sure of that? Well, I mean, Virginia does not have one of these statutes. So in Virginia, you can be sure that it's— Yeah, I mean, in North Carolina, it could have been done in some way that Exxon really doesn't approve of. I see I've exceeded my time. I apologize. I hope you'll give me a little rebuttal and I'll stop. Mr. Tripp? So why aren't they entitled to a trial on this issue of whether or not the inline blending is the way to go in order to maintain quality control, at least for their Lanham Act claim? Well, and not wanting to have my very first answer deferred, but it was my intention—I will only be before you this morning for seven minutes to talk to you about some of the general preemption issues as specifically as they apply to the Federal Renewal Program, the Federal Fuel Renewal Program. Who's going to answer that question? I'm sorry? Who's going to answer the question? Mr. Marshall is going to address the issues of the Lanham Act and also about the PMPA. Since I'm here representing the Attorney General, it seems that the most logical division of the issues, if you will, are to give the state of North Carolina the renewable fuels because many of the facts and things that you're very interested in hearing about today deal with the relationship, really, between the marketers and the suppliers. But I did want to talk to you today briefly about the federal ethanol— whether or not the ethanol blending statute is preempted by the Renewable Federal Program because, of course, as you all know, there's a strong presumption against the federal preemption of state laws. What is the purpose of the state law? The purpose of this state law is to— just like with the Federal Fuels Renewal Program, it is to enhance the production of ethanol and the— I thought it had to do with who's going to get the federal tax credit. Right. That's the purpose of it. There are no longer federal tax credits. Well, there aren't. And I would submit to this court that that's not the only intent of the statute. The intent of the statute is also to help with this increase in the annual use of renewable fuels and also, I think, to help with the relationship with the suppliers and the marketers. Specifically, I think, so that the marketers— or, excuse me, the suppliers don't end up with a monopoly in this area because, of course, one of the arguments that you hear today from the appellant in this case is that there's a conflict between the federal law and the state law and it's impossible for them to comply because there are these things that they want to be able to do that they can't under the statute and they need this guidance. But if you look at the things they want to do, they have already stipulated that those things are possible. For an example, the ethanol blending statute only requires that they offer these fuels in North Carolina. There's no restriction on what kind of quantity they offer, how many terminals that they provide with regard to where this is done. They say that they prefer to import this, what they call the CBOB, and I apologize, there are a lot of acronyms in this particular case, but they want to import CBOB products. But they can do that by blending premium and regular CBOB products to get this 87 octane conventional gas, which, of course, we see at the pumps. And third, they say that CBOB is not within the definition of gas under the ethanol blending statute, but if that's true and you accept that, then the suppliers, the logical process on that is that the suppliers don't have any obligation under the ethanol blending statute, which defeats the whole purpose that they say there's a conflict. So there is no conflict here. It's more the suppliers wanting to use this to enhance their business interests. And, of course, in preemption cases, you look at the underlying federal reg or federal statute to see what the purpose is, and the purpose is to increase annual use of renewable fuels, not to enhance a supplier's business interests. What's the purpose of that Exxon trademark? The purpose of the Exxon trademark? Well, again, I think that that's something you're going to hear more about. That's another lawyer? You can't answer that part. You're not the Lanham Act expert. I am not the Lanham Act expert. I'm interested in that Exxon trademark, whether I'm going to get Exxon gasoline or not. Well, and I am just here to talk to you about these renewable fuels issue because I think that it is worth addressing, and I think that because the preemption principles apply across the board to their arguments. And I do think it's interesting in this case that there were two summary judgment orders entered. One was entered as to a facial challenge in which we prevailed, and the second was entered as to an as-applied challenge, which we prevailed. But if you look at the basis for the orders and the arguments surrounding both orders, basically the second one was mainly a repackaging of the first. Why does that assist you? I think it assists because it just shows that they don't have anything new to support their claim. Or it shows the district court didn't think there was anything new. That is true, Judge Mons, and that is possible. But I think that our position, of course, would be that Judge Flanagan's order was very thoroughly thought out and that it did properly address those issues. With that, I am going to turn it over to Mr. Marshall because I know you want to hear from him about the remaining two issues. Thanks very much. You're going to tell us why he doesn't get a trial on the Atlanta matter. Good morning, Your Honors. Yes, Judge, I'm Charles Marshall, representative of the North Carolina Petroleum Convenience Marketers Association, which is an association comprised of hundreds of retailers and distributors of gasoline in North Carolina. Judge Agee, you asked... You're the ones who do the splash blending that we were talking about. That's exactly right, Your Honor. Judge Agee, you asked why not a trial on the quality control issue. And the answer is simple, and that is there's no conflict between the purposes of the Lanham Act, which are to prevent consumer confusion, and the ethanol blending statute itself. The question is, can you read these statutes in harmony, the state ethanol blending statute and the Lanham Act? And you can, just as the district court did. And here's why. All the ethanol blending statute does is preserve the retailers and the distributors' right to actually blend the gasoline with ethanol themselves, which, as Judge Motz mentioned, is exactly what federal policy both requires and encourages through a trade decree. He says the way they do it in the splash blending doesn't give you the same quality as what the refiners or distributors do when they put their gizmos up to it. Your Honor, the record does not reflect that at all, and I want to talk about... Well, then why shouldn't they have a chance to develop that record? Because we have stipulated facts that the parties agreed to and took to the district court on this issue. And here are some of those. Excuse me, Your Honor? What is that stipulated fact? Well, one of the stipulated facts is that since the 1980s, marketers in North Carolina and other states have been splash blending with ethanol. Since the 1980s, for 30 years. It doesn't say that it's equivalent. I thought that's what they're maintaining. He says inline blending is better. Okay. Inline blending and splash blending, if we get to the record of errors in this case, the only thing the record shows is that it's an imperfect process, and that's exactly what Judge Flanagan said. Which one's an imperfect process? Both of them. Your Honor, there is evidence... You're saying inline blending is no better than splash blending. That's exactly right. There's evidence in the record... They say inline blending is better than splash blending. Right. And if you accept their proposition for purposes of summary judgment, then you've got to have trial, don't you? You don't, Your Honor, in this case, and I'll tell you why. In this case... You have to accept your version of the facts. It seems to me... We don't even need to get to what... to uphold the summary judgment. Judge King, in this case, we don't even need to get to the question of which is better, and I'll tell you why. Well, if there's a difference, then that gasoline, if I want to buy BP gasoline in North Carolina, there's a chance it's going to be different than it is over the border here in Virginia or something. Well... If they don't have this, because BP didn't do it. BP didn't put the ethanol in it, and the distributors or the marketers put the ethanol in it with this splice blending, and it's really 90% of it's BP, and 10% of it's something that nobody knows what it is. Well, Judge King, the best way to answer your question is this. The question is... Or approximately 10%. The percentages may be different. Right. It may not be mixed up. Right. Can the suppliers, do they have the ability to control splice blended gasoline? And the answer is yes, and the record makes that clear. Not only has it happened for 30 years, but on this record, there's no evidence of consumer harm from splice blending. There's no evidence of a regulatory violation from splice blending. There's no evidence that the suppliers have not been using quality control measures for splice blending. Did you all have full discovery here? We did, including testing. And some of the questions are, what kind of quality control can we have? The answer is almost anything. You can have technical specifications. Well, I thought the record was pretty clear that you can test the way that they do it better than the splice blending test. That's not clear in this record, in this case? No. I think the record is clear. Again, I caution you, the other side gets to talk, too. Can we go back and look at the record? So carefully answer my question. Isn't there testimony, I thought, undisputed testimony in this record that the way that the non-splice blending could be tested more easily and more accurately than the splice blending? That is their position. So we have to take that, for purposes of summary judgment, as accurate. But also, there's record evidence that testing is done and has been done at the retail level as well. But it's not as accurate. In their opinion, it's not as accurate. But look, there hasn't been a trial, right? Right. So you would agree with me we have to take the facts into best light for them, right? Yes, that's the appropriate standard. So there's evidence both ways, is that what you're saying? But their own argument is that it's not the result that matters for Lanhamac purposes. It's the ability to impose quality control standards. That's what makes the product genuine. And you can impose standards. They say they want to be in control of it, and they need to be in control of it because it's their trademark. That's right. It's BP. It's their trademark, and so everybody assumes it's 100% BP, whether it's petroleum, gasoline, or whether it's corn, ethanol, or whatever percentage. And they don't do the last 10%, approximately. Then it's really not BP product. It is BP. They haven't put their stamp of approval on it unless they do it their way, which is in-line blending. It is a BP product, though, Your Honor, if it's manufactured according to the quality control standards that have been established and can be enforced by BP. And for the last 30 years, if there's quality control standards, and the record does, there are stipulations that these standards have been in place by some suppliers as to splash blending prior to the advent of in-line blending, that if these quality controls are in place and they're followed, then it is a genuine product because the right, and what the cases say, and the Shell case that API has cited, says it's the right to control the quality, the ability to control. So for conflict preemption, the question is, do we preserve that right under the North Carolina law? And the answer is yes because we are not infringing upon their right to impose quality control processes, whether it's testing, Your Honor, as one process, whether it's technical specifications at the ethanol blending site, whether it's contractual provisions for termination or Lanham Act enforcement. So there's a front-end ability to regulate splash blending, and there's a back side. The way I read their papers, they say that's not efficient. Right, but there's no evidence in the record that A, that it's not sufficient, but why does it matter if they have the ability to establish and enforce these by contract? For splash blending. Well, they say that the whole process of splash blending is not sufficient, that they want to do the inline blending. Right, they want to do the inline blending, you're right. They say splash blending's not acceptable. Right, that they can only preserve their product. That's their opinion. The record doesn't show. But we're on summary judgment. Right, but they... You're saying there's no evidence that inline blending is superior to splash blending. That's exactly right. There's no evidence presented in this record. So if there was evidence in this record that it was more accurate, that inline blending was more accurate than splash blending, they would be entitled to a trial. I would say no for this reason, because you said more accurate. To me the question is... Well, we're in a world of comparison. Did both sides have experts? Right. No, API did. We did not. They had an expert and you didn't, and their expert, did he say or she say that this inline blending was a better process? Yes. But that doesn't mean... They got expert testimony then that the inline blending is superior process. No, but that doesn't mean... But the question is, for conflict preemption analysis, the question is, is there an ability to control the blending process through splash blending? Is there an ability to control the splash blending process? I thought they were saying that part of the problem with that is that if they do it inline, then they have control of the whole process before it goes into the pump tank that the consumer is going to get. Otherwise, if it's splash blending, then they're limited to kind of remedies after the fact once it starts to come out of the pump. Not if you impose the quality specifications for how the ethanol is going to be blended. And again, because this is a process that has been going on, the suppliers have been able to impose. And I'm sure for the last 30 years, we don't have evidence that a contract's been terminated for splash blending errors. And certainly, I would think that would be in the record here if it was such a problem. And I want to be really careful because I don't want to concede the fact just because an expert may have testified somewhere that inline blending, in their opinion, was superior technologically. That's not the question. The question is, is there evidence that you don't have the ability to control blending through the splash blending process through quality control procedures? And the evidence, the stipulated record, doesn't show any evidence that splash blended gasoline and that the quality control processes are insufficient to protect consumers from deception under the Lanham Act. And we can't forget that's the federal objective here, whether there's consumer confusion under the Lanham Act that's being infringed. The question is not whether there's a special form of quality control where others exist historically. Well, there's also an interest in BP and Exxon and Hess and all of them being able to control, have quality control over the product that they sell at their service station that has their sign out front. Right, and you can do that through imposing quality control standards. Consumers as a corollary. Right. I know if I'm filling up with it that that's what I'm getting. And I'll be getting the same thing in North Carolina that I get in Washington, D.C. or Virginia or South Carolina. The record shows, Your Honor... There are signs out there. That's right. And there's no evidence of any consumer harm from splash blending in this record at all. That's a stipulated fact. There also is evidence... Is that a requirement for the cause of action? I believe it is here because... What case holds that? The objective of the Lanham Act is to prevent consumer confusion. Right. So if we have no... You don't have to prove a violation of the Lanham Act. You don't have to show that there has been damage. Right. But you have to have some evidence of consumer confusion. And there's no evidence that any consumer... He didn't know whether he could get his gas in Virginia or North Carolina. He thought he could only get the pure gas in Virginia and he wasn't sure whether he was getting the right thing in North Carolina because he didn't know whether it was going to be the 10% or not. Again, Your Honor, you use pure gas and our contention is if this gasoline... None of it's pure, for starters. If the gasoline is splash blended according to the supplier's quality control processes that this law allows them to impose and enforce, if it's splash blended according to those procedures established by the suppliers, then our position is that is a genuine product. The fact that marketers are blending gasoline... But marketers are doing it and not doing it under the supervision of the supplier. But there's no case, Your Honor, that's been cited anywhere in this entire litigation that says that a trademark holder has an unfettered right to have blanket immunity from any state law that may impact some element in their mind of quality control when others are available and have been working and there's not evidence that those measures are insufficient from a Lanham Act perspective to protect consumers against confusion, not to fulfill a market objective. ...petroleum context. I mean, there's lots of trademarks, whether it's for clothing or automobile parts or cosmetics or medicine, where the manufacturer has very strict controls over any type of subcontract to manufacture their product. And if you violate that, then you're out. And that's a contractual provision to enforce a quality control standard that's absolutely preserved here. ...because they're saying North Carolina prohibits that form of trademark control. That one form... I see my time is up. If I could just complete this. That one form of control. But there's no Lanham Act cases that say that the purpose of the Lanham Act is to protect the supplier from being able to singularly choose any quality control measure they want when others are available and adequate, haven't been proved to be insufficient, and otherwise violate state law. I think that's... There haven't been cases... All the cases say are the Lanham Act allows you to establish and enforce quality control standards. We don't dispute that. We think the ethanol blending statute allows suppliers to do that today. And there hasn't... And I want to close on one big point because I don't want to get off the record here. There was expert testimony. And certainly, the APS position is that inline blending is superior to splash blending. That's been their position all along. We don't agree with that at all. We don't believe there's any record evidence that shows that it is, in fact, superior to splash blending based on the record. But if there is such evidence, are they entitled to a trial? If there's such evidence in this record? No. And the only evidence that matters is whether the state law preserves the ability to establish and enforce quality control proceedings over splash blending. As long as it does that, this statute can be read in harmony. There's no conflict with the Lanham Act. And suppliers will have the decision if they want to continue a franchise relationship or if they want to sell the gasoline themselves. It doesn't prevent inline blending at all. It just makes sure that the marketers have the ability to blend themselves under the standards imposed by the suppliers. Thank you for the extra time. We'll give you a couple minutes. On the evidence in the record that inline blending is better than splash blending, the evidence is collected on page 36 of the blue brief. It does include testimony from our expert, Mr. O'Brien. It includes testimony from virtually all of our fact witnesses. But there are also stipulations in the record. This is Joint Appendix 118 to 123 that we found 17 errors in the entire United States over a three-year period from inline blending. And we found 18 errors in two weeks from one North Carolina distributor. So if you multiply that out, there are 17 errors. Does that mean that there was some injury to a vehicle or that the percentage of ethanol and gas wasn't right? It means, and you can see it in the Joint Appendix at 118 to 123 that when tested, the ethanol level was either above or below 10%. Some of the differences were relatively small, but some were large. Some were 15, 20, 25%. And again, this is all in the record. Is there a range that's considered to be accurate when you say 10%? Is it like 9.5 to 10.5 or 9 to 11? It needs to be very close, and I think it does have to be. It may even be tighter than that, Your Honor, because, again, I apologize for the complexity. If it's a little bit too low, you get out of compliance with something called the RVP rule, and you have a regulatory violation, now, it may not be caught many times, but if it's too high, as we were talking, that's when you can really cause problems for consumers, and there's a lot of debate about if you get up even to 15%, and some of these violations in two weeks by one distributor were above 15%, well above, so yes, so I'm really not sure what the argument is that there's not evidence in this record that splash blending is a lesser form. Does the entirety of your position on the proposition that there are disputes of material fact relate to the inline blending and the splash blending? I think that is by far the key factual issue. There's also an issue about what would count as adulteration, misbranding, other forms of trademark violation under the agreements that the individual refiners have and that's an issue you'd only get to, I mean, we were discussing earlier, we think an overarching issue that would simplify a lot of the issues is if you would read those half dozen cases that I was trying to cite and say, you know, look, as we were discussing, if the trademark owner puts the trademark on that product, it has to be the quality control standards that the trademark owner says are the right ones, and it has to be the product that the trademark owner certifies as genuine, and that can mean you buy it from the trademark owner. Well, picking up on that, that very, the thing that I found differentiates this case from those cases is that the product that is sold here, either by your client or by his client, is adulterated. It has this 10% addition to it. Everybody agrees about that. So it strikes me, it's not a, and the question boils down to, do you have to adulterate it the way you want to, or are they free to adulterate it in a different way as long as you can check it? Right, and that is, as I say, What case do you have that you think is closest on that? Let me bring them back up. The DZ Enterprises case, I ran through half a dozen earlier. Those deal with pure adulteration cases. It's not like you have Exxon Gas coming right out and you want to sell Exxon Gas and they're going to add the ethanol. Somebody's adding 10% ethanol no matter what. Well, these cases deal with adding unbranded gasoline to, they're another brand. But it's really not the same because you're required under federal law, as I read it, to add the 10%. Everybody's required to add 10% ethanol. That's not exactly, Perhaps I've overstated it. But there's an obligation to add a lot of ethanol. But the cases... So just adding ethanol is not adulterating things? Well... You're saying doing it the way they add it is adulterating it because they should use your method. I guess what I would say is you could call it adulteration, you could call it misbranding, you could call it commingling, you could call it misappropriation. These cases that we cite say even if it's chemically identical, even if it's what you're required to sell, even if it comes from the same tank, none of that is a defense to a trademark violation. And so again, if the state law... You're saying you have to do it yourself. Well... They can't do it for you. The simplest way I can say is if the state law didn't exist and if you had a dealer out there someplace that was dumping ethanol into Exxon Gas without permission and their defense was just what you're suggesting, they said, well, this has to be done under federal law so I can do it. That would still be a trademark violation because Exxon could say, well, yes, but we want to do it ourselves or we want you to do it with inline blending or, you know, it's what the trademark owner says is the best quality control and is what they're willing to put their trademark on that counts. Do we have other questions? No. You sure? I'm afraid to do. Thank you very much. We will come back.
judges: Diana Gribbon Motz, Robert B. King, G. Steven Agee